IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

Michelle D. McCall,      *

                          *

     Plaintiff,       *

                          *

vs.                    *     CIVIL ACTION 06-00363-BH-B

                          *

MICHAEL J. ASTRUE,     *
Commissioner of        *
Social Security,       *

                          *

     Defendant.       *

## REPORT AND RECOMMENDATION

Plaintiff Michelle D. McCall ("Plaintiff") brings this action seeking judicial review of a final decision of the Commissioner of Social Security denying her claim for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 et seq., and 1381 et seq.  On April 23, 2007, the parties waived oral argument.  (Docs, 15, 16). Upon careful consideration of the administrative record and the memoranda of the parties, it is **RECOMMENDED** that the decision of the Commissioner be **REVERSED** and **REMANDED.**

## I.  Procedural History

Plaintiff protectively filed applications for disability insurance benefits and supplemental security income on October 9, 2001 and August 28, 2001, respectively, alleging that she has been disabled since November 24, 1998, due to chronic pain syndrome, muscle spasms, depression, and cervical and lumbar strain.  (Tr.

41-42, 102-104, 127, 140, 148, 366-369). Plaintiff's applications were denied at the initial level and upon reconsideration. (Id. at 41-42, 61-65, 370-375). Plaintiff filed a timely Request for Hearing before an Administrative Law Judge. (Id. at 66-67, 376).

On August 14, 2002, Administrative Law Judge Ricardo M. Ryan ("ALJ Ryan") held an administrative hearing which was attended by Plaintiff, her representative and a vocational expert ("VE"). (Id. at 543-558). After some preliminary testimony, the ALJ adjourned the hearing so that a vocational report could be submitted. (Id.) On December 26, 2002, ALJ Ryan issued an unfavorable decision finding that Plaintiff is not disabled. (Id. at 43-56). Plaintiff requested review of the ALJ's decision. (Id. at 82). On April 10, 2003, the Appeals Council ("AC") remanded the case to the ALJ for further development regarding Plaintiff's residual functional capacity ("RFC") to perform her Past Relevant Work ("PRW"). (Id. at 83-86). A second hearing was held on July 2, 2003; however, no testimony was received. The ALJ adjourned the hearing so that a psychiatric consultative examination could be obtained. (Id. at 559-563). On October 15, 2003, a third hearing was held, which was attended by Plaintiff, her representative and a vocational expert. (Id. at 564-602). On May 14, 2004, ALJ Ryan issued an unfavorable decision, finding that Plaintiff is not disabled. (Id. at 27-39). Plaintiff filed a request for review, and on May 26, 2006, the Appeals Council denied Plaintiff's request. (Id. at 7, 26).

Thus, the ALJ's decision became the final decision of the Commissioner in accordance with 20 C.F.R. § 404.981. (<u>Id</u>. at 7-9). The parties agree that this case is now ripe for judicial review and is properly before this Court pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

**II.   <u>Issues on Appeal</u>**

A.   Whether the ALJ erred by failing to find that Plaintiff met Listing 12.05C?

B.   Whether the ALJ erred by failing to assign controlling weight to the findings of Plaintiff's treating physicians?

C.   Whether this case should be reversed and remanded so that the ALJ may consider the new and material evidence submitted to the Appeals Council?

**III. <u>Factual Background</u>**

Plaintiff was born on December 16, 1962, and was 40 years old at the time of the October 2003 administrative hearing. (Tr. 547, 568). Plaintiff, who testified that she can read and write, has a 12th grade education and a vocational certificate in cosmetology. Additionally, Plaintiff completed an auto-mechanics course and has past work experience as a pet toy assembler, supervisor and hotel cleaner. (<u>Id</u>. at 128, 133, 141-146, 160-168, 181, 188, 549-550, 570-571). While Plaintiff alleged a disability onset date of November 24, 1998, she continued to work through 2000 and thereafter, drew unemployment benefits through 2001. (<u>Id</u>. at 120, 175, 577, 584-584). She reported that she last worked in 2001 and

supervised between 12 and 20 employees[1]. Plaintiff indicated that she was fired from her job at the pet toy store because she was not able to stand, lift and walk all day as required. (Id. at 167).

Plaintiff testified that she takes 13 different prescription medications (including Neurontin, Ecadotril, Hydrocort, Naprosyn, Amitriptyline, a nerve pill, Elavil, Endomycin and Chromosome shots) for fibromyalgia, carpal tunnel in both hands, arthritis in her legs, high blood pressure and depression. (Id. at 579-582). She further testified that due to pain, she has a very hard time walking, sitting and lying down and that she is unable to drive or do anything. (Id. at 581). Plaintiff also indicated that a MRI scan in 2000 revealed that she had 5 bulging disks in her back as a result of an earlier car accident, and that her back never improved. She also testified that she has cervical, thoracic and lumbar strain with tension headaches. (Id. at 583-584).

Regarding her daily activities, Plaintiff reported that her mother drives for her and does her grocery shopping, and that her mother, son and landlord clean her house. Plaintiff also indicated that does not cook or go out to visit with others. According to Plaintiff, she does her laundry, reads and watches television, attends church on Sundays, and visits people who stop in to check on her. (Id. at 587-592). Plaintiff testified that she is very

---

[1]At the August 2002 hearing, Plaintiff indicated that she supervised 20 employees, but at the October 15, 2003 hearing, Plaintiff indicated that she supervised 12 employees. (Id. at 541, 574).

stressed due to her medical condition, her lack of employment and her lack of income.  (Id. at 592-593).

### IV.   Analysis

### A.   Standard of Review

In reviewing claims brought under the Act, this Court's role is a limited one.  The Court's review is limited to determining 1) whether the decision of the Secretary is supported by substantial evidence and 2) whether the correct legal standards were applied. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990).[2]  A court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).  The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence. Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991); Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (holding substantial evidence is defined as "more than a scintilla but less than a preponderance" and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion[]").  In determining whether substantial evidence exists, a court must view the record as a whole, taking into account evidence favorable, as well as unfavorable, to the Commissioner's decision.  Chester v. Bowen, 792 F. 2d 129, 131 (11th

---

[2]This Court's review of the Commissioner's application of legal principles is plenary.  Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).

Cir. 1986); <u>Short v. Apfel</u>, 1999 U.S. DIST. LEXIS 10163 (S.D. Ala. 1999).

**B.   <u>Discussion</u>**

An individual who applies for Social Security disability benefits must prove his disability.   20 C.F.R. §§ 404.1512, 416.912.   Disability is defined as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."   42 U.S.C. §§ 423(d)(1)(A), 404.1505(a), 416.905(a).   The Social Security regulations provide a five-step sequential evaluation process for determining if a claimant has proven her disability.   20 C.F.R. §§ 404.1520, 416.920.[3]

---

[3]The claimant must first prove that he or she has not engaged in substantial gainful activity.  The second step requires the claimant to prove that he or she has a severe impairment or combination of impairments. If, at the third step, the claimant proves that the impairment or combination of impairments meets or equals a listed impairment, then the claimant is automatically found disabled regardless of age, education, or work experience. If the claimant cannot prevail at the third step, he or she must proceed to the fourth step where the claimant must prove an inability to perform their past relevant work.  <u>Jones v. Bowen</u>, 810 F.2d 1001, 1005 (11th Cir. 1986).  In evaluating whether the claimant has met this burden, the examiner must consider the following four factors: (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; (4) the claimant's age, education and work history.  <u>Id</u>. at 1005.  Once a claimant meets this burden, it becomes the Commissioner's burden to prove at the fifth step that the claimant is capable of engaging in another kind of substantial gainful employment which exists in significant numbers in the national economy, given the claimant's residual functional capacity, age, education, and work history.  <u>Sryock v. Heckler</u>, 764 F.2d 834 (11th Cir. 1985).  If the Commissioner can demonstrate that there are such jobs the claimant can perform, the claimant must prove inability to perform those jobs in order to be found disabled.  <u>Jones v. Apfel</u>, 190 F.3d 1224, 1228 (11th Cir. 1999). <u>See also Hale v. Bowen</u>, 831 F.2d 1007, 1011 (11th Cir. 1987) (citing <u>Francis v. Heckler</u>, 749 F.2d 1562, 1564 (11th Cir. 1985)).

In case <u>sub judice</u>, the ALJ determined that while Plaintiff has the severe impairments of depression, mild mental retardation, mild disc disease and possible fibromyalgia, they do not meet or medically equal the criteria for any of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, Regulations No. 4. (Tr. 38). The ALJ determined that Plaintiff retains the RFC to perform at least light exertional work which is not significantly compromised by nonexertional limitations, and relying on the testimony of the VE, found that Plaintiff can return to her PRW as a pet toy assembler or hotel cleaner. (<u>Id</u>.) Accordingly, the ALJ concluded that Plaintiff is not disabled. (<u>Id</u>.)

The evidence of record reveals that Plaintiff was injured in a motor vehicle accident on November 24, 1998. X-rays of her cervical spine demonstrated normal alignment of the cervical vertebra with maintained disc space. There was no evidence of degenerative changes. (Tr. 195-199). On December 31, 1998, Plaintiff commenced treatment with Russell Hudgens, M.D. ("Dr. Hudgens") of Old Shell Orthopaedics Associates, P.C., for complaints of neck and back pain. His exam revealed normal deep tendon reflexes and no motor/sensory deficits of the upper/lower extremities. Dr. Hudgens assessed Plaintiff with cervical and lumbar strain and recommended physical therapy. (<u>Id</u>. at 228-228A). Dr. Hudgens's January-February 1999 treatment notes indicate that Plaintiff had improved with physical therapy and had no neurological

deficits.   (Id. at 225).   In March of 1999, Plaintiff began complaining of right shoulder pain and renewed neck pain, and a cervical MRI demonstrated mild disc bulging at C5-6 and C6-7.  (Id. at 223-224).   A January 18, 2000 exam revealed no restriction of cervical motion and no motor sensory deficits of upper extremities. An EMG and nerve conduction study were normal.  (Id. at 222-223). Dr. Hudgens's  August-October 2000 notes reflect that Plaintiff complained of burning pain in her neck, shoulder, right arm and right leg, and that she had a good bit of inappropriate pain upon palpation.   Dr. Hudgens  indicated  that  Plaintiff  exhibited significant symptom magnification.  (Id. at 220-221).

On November 8, 2000, Plaintiff was admitted to Springhill Memorial Hospital's Emergency Room ("ER") for pain. Plaintiff  was assessed with cervical radiculitis. (Id. at 204-206).  On November 16, 2000, Dr. Hudgens noted that Plaintiff had no objective signs of motor/sensory deficits, but continued to report increased pain that did not appear to be associated with cervical disc problems. (Id. at 217).  On November 20, 2000, Plaintiff was admitted to the ER after suffering an injury at work.  She was assessed with a neck and back injury and cervical/back strain and given Skelaxin, Rufen and Tylenol #3.  Her cervical, thoracic and lumbar spine x-rays were found to be normal.  (Id. at 207-211).

From December 15, 2000 to July 27, 2001, Plaintiff received treatment from William Denson, M.D., ("Dr. Denson") of Mobile

Neurology, for complaints of neck pain, back pain and recurrent headaches. (Tr. at 216-234). During this time, Dr. Denson assessed Plaintiff with post-traumatic cervical/thoracic/lumbar strain and tension headaches, with some slow improvement at times, prescribed her Vioxx, Norflex and Amitriptyline, and had her undergo physical therapy. (Id. at 229). At the end of December 2000, Dr. Hudgens opined that Plaintiff was capable of doing light work with no lifting over 25 pounds. (Id. at 216). On July 27, 2001, Dr. Denson noted that Plaintiff had shown no further improvement and he recommended referral to a chronic pain management specialist and possibly work hardening or evaluation. He also recommended weaning her off of her medications. (Id. at 229).

On August 29, 2001, Plaintiff presented to Chris Nichols, M.D., ("Dr. Nichols") for complaints of pain on her right side at a level 10 on the 1-10 pain scale. It was noted that it was difficult to examine Plaintiff because of her hysterics. Her exam revealed no radicular symptoms, full ROM of right shoulder, hip and knee and intact sensations, and he assessed her with chronic pain type syndrome and possible somatization disorder. (Id. at 247-248). On September 12, 2001, Dr. Nichols noted that Plaintiff had total relief from much of her pain from a simple trigger point injection. He further noted that Plaintiff had exaggerated tenderness in the rhomboids and suggested she receive psychiatric counseling. He diagnosed her with chronic pain syndrome, possible somatization

disorder and possible myofascial pain. (Id. at 246).

On September 13, 2001, Plaintiff was seen by Jake Epker, Ph.D., ("Dr. Epker") of Psychological Services of Mobile, for a behavioral medicine evaluation. (Id. at 257-261).  Her exam revealed a dysthymic mood, and it was noted that she exhibited numerous sighs and moans, "presumably to draw attention" to her pain and distressed mood but there was no evidence of formal thought disorder and her intelligence was estimated to be in the borderline to low-average range. (Id. at 258-259). Dr. Epker noted that Plaintiff's MMPI-2 test results were invalid as she malingered and exaggerated her psychological problems and that the relationship of her pain behavior to her pain report was inconsistent (she exhibited pain behavior "designed to elicit attention"). (Id. at 259-260). Dr. Epker concluded that she was depressed, although any depression as a result of life stressors would likely be exaggerated.  He noted that Plaintiff had poor insight, a tendency to exaggerate symptoms, and that her family members reinforced the notion of her disability and impairment.  He thought she could benefit from some adaptive coping skills, a brief course of individual psychotherapy (3 sessions) and an increase of Effexor. (Id. at 261).  Dr. Epker diagnosed Plaintiff with chronic pain disorder associated with medical and psychological factors (Axis I); diffuse chronic pain (Axis III); functional limitations (Axis III); and a GAF of 65 (Axis V). (Id.)  On September 21, 2001, Dr. Epker wrote a letter to Dr.

Nichols, Plaintiff's referring physician, and stated that Plaintiff definitely appeared to have a tendency to exaggerate her symptoms and that she needed to be told that she "must learn to live with much of her pain." (Id. at 256).

During October/November 2001, Plaintiff reported to Dr. Nichols that she was experiencing excruciating right shoulder pain although she also acknowledged that she was benefitting from her medication. Dr. Nichols noted that Plaintiff showed exaggerated tenderness and gave her trigger injections. (Id. at 246). Dr. Nichols further noted that Plaintiff seemed to have "some psychogenic overlay" and he doubted that the injections provided much relief and questioned her pain rating. (Tr. 243-244).

On November 6, 2001, Dr. Epker noted that Plaintiff was experiencing some legitimate pain secondary to her injury but that the extent of her functional limitations and pain severity was difficult to discern due to her exaggerated pain behaviors and continued reporting of pain symptoms that are quite diffuse and inconsistent with injury reported. He further noted that the potential for secondary gain is quite strong and likely plays a role in her presentation, concluding that Plaintiff's prognosis was poor. (Id. at 255). On November 8, 2001, Dr. Epker completed a Clinical Assessment of Pain form, in which he noted that Plaintiff undoubtedly experiences pain secondary to her injury, but that the extent she reports has an exaggerated component that leads her to

limit herself more stringently in activities than she would otherwise need.  (Id. at 253-254).

On November 20, 2001, Dr. Epker completed a Medical report in which he noted that he would not perform an examination of Plaintiff in connection with her disability claim because she tends to exaggerate her pain complaints to such an extent that it would be difficult to make an accurate assessment of her limitations.  He diagnosed her with chronic pain disorder with medical and psychological features, r/o somatoform disorder (Axis I).  He noted that her prognosis was poor as she appeared to be invested in maintaining and maximizing a sick role.  (Tr. 250-251).

On December 28, 2001, State Agency psychological consultant Donald E. Hinton ("Dr. Hinton") reviewed Plaintiff's records and completed a Mental Residual Functional Capacity Assessment under Listing 12.07.  He concluded that Plaintiff has moderate limitations in her ability to understand, remember and carry out detailed instructions, but no other significant limitations.  He further concluded that she has the ability to understand and remember simple tasks and can carry out short and simple tasks.  (Tr. 271-274).

Also on this date, Dr. Hinton completed a Psychiatric Review Technique ("PRT") form, in which he assessed Plaintiff her under Listing 12.07 (Somatoform Disorder).  He concluded that Plaintiff has a mild degree of limitations in her activities of daily living and maintaining social functioning, and a moderate degree of

limitation with maintaining concentration, persistence or pace. (Id. at 275-288).

Also on this date, a State Agency medical consultant completed a Physical Residual Functional Capacity Assessment for Plaintiff's chronic pain syndrome. The consultant concluded that Plaintiff could occasionally lift/carry 10 pounds; frequently lift/carry 10 pounds; stand/walk/sit 6 hours per day; had unlimited push/pull abilities; could occasionally kneel; could frequently climb ramp, stairs, ladder, ropes or scaffolds, balance, stoop, crouch or crawl; and had no manipulative, visual, communicative or environmental limitations. The consultant also referenced Dr. Hudgens's December 2000 findings, and concluded that Plaintiff is "capable of working light duty" with "no lifting over 25 pounds." (Tr. 262-270).

On February 19, 2002, Plaintiff was seen by Victoria Parada, M.D. ("Dr. Parada"), at Stanton Road Clinic ("Stanton"), for complaints of pain and depression. She was assessed with chronic pain syndrome and depression.[4] Plaintiff was referred to Mobile Mental Health Center ("MMHC") for group therapy, prescribed an antidepressant and directed to return in four months. (Id. at 332, 361). Plaintiff was seen at the Mobile County Health Department ("MCHD") on May 30, 2002, for increased blood pressure, a need for a medical adjustment and chronic pain. The records reflect that her medications included Effexor, Vioxx, Celexa, Darvocet, Neurontin and

---

[4]A third condition was listed; however, it is not legible.

Motrin.  (Id. at 299, 314-315).

On June 3, 2002, Plaintiff was seen by orthopedic surgeon William Crotwell, M.D., ("Dr. Crotwell") for a consultative examination at the request of the State agency. Dr. Crotwell assessed Plaintiff with mild scoliosis by x-ray and a history of cervical and lumbar strain healed with no objective evidence of any problems. He concluded that Plaintiff could carry out normal work activity as she did not have any major orthopaedic problems; however, he noted that "there may be some psychological problems going on[.]"  (Id. at 292-294).  Dr. Crotwell also completed a Physical Capacities Evaluation form in which he concluded that Plaintiff could sit, stand and walk for four hours at one time and for eight hours total per day; occasionally lift 100 pounds; occasionally carry 26-50 pounds; frequently carry 21-25 pounds; frequently lift 26-50 pounds; frequently bend, squat, crawl and climb; continuously reach; use her hands and feet for repetitive action; and could continuously carry up to 25 pounds and continuously lift up to 20 pounds.  (Id. at 295).  Dr. Crotwell further concluded that Plaintiff has a moderate restriction from work around unprotected heights and a mild restriction from work around moving machinery and driving.  He opined that Plaintiff "could perform normal work activities moderate light sedentary." (Id.)

On July 23, 2002, Plaintiff was seen at MCHD for severe pain

and "nerves."  She was assessed with cervical disc disease and pain and was given Toradol, Skelaxin and Darvocet.  (Tr. 300, 316).  On August 29, 2002, Plaintiff presented in tears at the Stanton Clinic, and was seen by Dr. Parada, for complaints of neck, right arm and right leg pain.  Her brain and lumbar spine MRI were normal, her cervical spine MRI demonstrated mild bulges at C3-7 that did "not efface the thecal sac or narrow the lateral recesses." (Id. at 302-303, 330, 334A-335, 364-365).  Plaintiff was assessed with chronic pain and was advised to consider group therapy for anxiety.  (Id. at 365).  On October 10, 2002, Dr. Parada noted that Plaintiff's strength was normal in all extremities but she had multiple trigger points.  She diagnosed her with chronic neck pain and fibromyalgia[5]. (Id. at 334, 360).  On October 20, 2002, Plaintiff was treated at USA's ER for neck, arm, leg and back pain. The treatment notes reflect that she presented crying, was diagnosed with fibromyalgia and was prescribed Darvocet.  (Id. at 307-313).

On October 31, 2002, Plaintiff was seen at MCHD where she was assessed with hypertension, chronic back and neck pain and 20 disc disease. Her prescriptions were increased.  (Tr. 317).  On November 21, 2002, Dr. Parada, at Stanton, noted that Plaintiff reported increased pain and that she was unable to walk.  She was assessed with chronic neck pain/mild disk herniation, generalized myalgias and abnormal gait not clearly spastic.  (Id. at 333, 362).

---

[5]A third diagnosis was not legible.

15

In January 2003, Plaintiff commenced treatment at Mobile Mental Health Center ("MMHC") for complaints of depression, suicidal ideations/thoughts and auditory hallucinations. (Id. at 318-326, 336-349). She reported occasional suicidal thoughts, hearing voices calling her name; she was tearful.  Her exam revealed a depressed mood, tearful and sad affect, hearing voices, suicidal thoughts, poor to fair insight/judgment, poor sleep/appetite and she was diagnosed with major depression, severe, possible psychotic features and r/o mood disorder due to GMC (Axis I); personality disorder (Axis II); chronic pain, fibromyalgia, displaced disc, arthritis, acid reflux and hypertension (Axis III); and multiple stressors (limited or no income, unemployed, medical condition, single parent and history of sexual abuse) (Axis IV). (Id. at  318, 320-325, 342-347).  She was prescribed Zoloft, and instructed to go to therapy and pain management.   MMHC was to follow up for psychotropic medications.  (Id. at 320-325, 345, 347). A ninety day review was conducted in April 2003. It was noted that Plaintiff's suicidal ideations/thoughts decreased as did auditory hallucinations to none per week and she verbalized need to take medications regularly. (Id. at 341). The records reflect that Plaintiff continued to receive treatment at MMHC through June 2003.  (Id. at 336).

On February 11, 2003, Dr. Parada wrote a letter stating that Plaintiff had a history of chronic pain, depression and fatigue and multiple complaints of generalized muscle pain.  Her diagnostic

work-up revealed cervical degenerative disease at sacral levels without herniation and her blood work-up revealed increased rheumatoid factor. Dr. Parada's noted that her diagnosis would most likely be concurrent with fibromyalgia and chronic fatigue syndrome, and that she should be considered "at least for temporary disability." (Tr. 327, 329). On March 6, 2003, Dr. Parada completed a form for the Mobile County Department of Human Resources, in which she stated that Plaintiff's condition (chronic myalgias and arthralgias, arthritis and fibromyalgia, chronic pain, decrease range of motion in joints) has eliminated all likelihood of her ability to engage in gainful employment again; that her condition has substantially reduced her ability to work; and that for at least the next 6 months, she would be unable to work full time. (Id. at 185-186). On April 17, 2003, Dr. Parada noted that Plaintiff reported doing slightly better, that her depression was improved and that she was taking Zoloft and being followed by MMHC. She was assessed with chronic pain syndrome/possible fibromyalgia and depression ("better"). (Id. at 331, 359, 363).

On July 30, 2003, John Davis, Ph.D., ("Dr. Davis") conducted WAIS and WRAT testing during a consultative psychological/mental examination of Plaintiff. He concluded that Plaintiff had valid IQ scores of verbal 66, full scale 62 and performance 63, placing her in the mild range of mental retardation. He further concluded that Plaintiff had moderate impairments with understanding, remembering

and carrying out detailed or complex instructions, maintaining attention, concentration or pace for periods of time of at least two hours, and using judgment in detailed or complex work-related decisions. He further opined that she had the ability to perform simple, routine repetitive type tasks. (Id. at 352-357). Dr. Davis assessed Plaintiff with mild mental retardation and depression secondary to a general medical condition. (Id. at 356). Dr. Davis noted that only the results of MMPI testing were invalid, suggesting that she either was not reading the items, was so disoriented she was not aware of the situation ("unlikely") or that she was trying to emphasize the physical problems she has to either draw attention to herself for treatment purposes or for the benefit of accessing secondary gains. (Id.) Dr. Davis opined that Plaintiff's mental retardation was a lifelong condition; that her ability to function in an age appropriate manner, cognitively, communicatively and socially was mildly to moderately impaired; that her capacity to show concentration, persistence and pace were mild to moderately impaired; and that she has the ability to do simple, routine, repetitive type tasks, can get along with others and can manage benefits. (Id. at 356-357). Dr. Davis concluded that Plaintiff's mental capacity "should be considered as an add-on factor but in and of itself is not disabling. Decisions about her disability need to be based on the general medical condition of this claimant." (Id. at 357).

On August 7, 2003, Plaintiff was seen at Stanton for joint, neck, shoulders, elbows, wrists and ankle pain.  She was assessed with fibromyalgia and was given Indocin and Neurontin.  (Id. at 358).

On August 11, 2003, Dr. Davis completed a Medical Source Opinion Form ("Mental") in which he found that Plaintiff has moderate impairments with understanding, remembering and carrying out detailed or complex instructions, maintaining attention, concentration or pace for periods of time of at least two hours, and using judgment in detailed or complex work-related decisions.  He found she had mild impairments in understanding, remembering and carrying out simple, one and two step instructions, maintaining social functioning, maintaining activities of daily living, responding appropriately to supervisors, co-workers, customers or other members of the general public, using judgment in simple one or two step work-related decisions and dealing with changes in a routine work setting.  (Tr. 350-351).

On August 25, 2003, Christina Stebbins, M.D. ("Dr. Stebbins") completed a form for the Mobile County Department of Human Resources, in which she concluded that Plaintiff's condition (fibromyalgia, cervical degenerative disc disease, chronic fatigue syndrome) has eliminated her ability to engage in gainful employment.  (Tr. 191-192).

**1.   Whether the ALJ erred by failing to find that Plaintiff met Listing 12.05C?**

Plaintiff contends that the ALJ erred by failing to find that she met Listing 12.05C due to an IQ below 70 and additional physical and mental impairments (neck, shoulder, elbow, wrist, knee and ankle pain, muscle burning, fibromyalgia, chronic fatigue, major depressive disorder [recurrent, severe, psychotic features] and a GAF of 50).   In response, Defendant concedes that Plaintiff's IQ scores are between 60-70 and that she has an additional severe physical/mental impairments.   Defendant contends, however, that Plaintiff's IQ scores are inconsistent with the evidence and that she failed to present evidence of deficits in adaptive behavior prior to age 22.

Listing 12.05C falls under §12.00 MENTAL DISORDERS and provides as follows regarding mental retardation:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.   The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied ···· C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.[6]   Thus, a claimant meets the criteria for presumptive disability under Listing 12.05C when she presents a valid IQ score of 60-70, an onset of impairment before age 22 _and_ evidence of an additional and significant mental or physical

---

[6]See also Cobb v. Barnhart, 296 F. Supp. 2d 1295 (N.D. Ala. 2003); Davis v. Shalala, 985 F.2d 528 (11th Cir. 1993)(quoting Listing 12.05C).

impairment (<u>i.e.</u>, having more than "minimal effect" on the claimant's ability to perform basic work activities). <u>See</u>, <u>e.g.</u>, <u>Edwards by Edwards v. Heckler</u>, 755 F.2d 1513, 1516 (11th Cir. 1985).[7]  Claimant bears this burden.  (<u>Id</u>.)  In order to be considered disabling, an impairment must be accompanied by work-related functional limitations.  <u>See</u>, <u>e.g.</u>, <u>Gross v. Heckler</u>, 785 F.2d 1163, 1166 (4th Cir. 1986).  In this circuit, it is presumed that a person's I.Q. remains fairly constant throughout her life and a valid I.Q. test meeting the Listing criteria creates a rebuttable presumption that the condition manifested itself before age twenty-two. <u>Hodges v. Barnhart</u>, 276 F.3d. 1265, 1268-69 (11th Cir. 1992).  A valid I.Q. score need not be conclusive of mental retardation where the I.Q. score is inconsistent with other evidence in the record on the claimant's daily activities.  <u>Lowery v. Sullivan</u>, 979 f.2d 835, 837 (11th Cir. 1992).

In his decision, the ALJ acknowledged Plaintiff's IQ scores of verbal 66, performance 63 and full scale 62 (Tr. 35), but he wholly failed to make any reference whatsoever to Listing 12.05C, and it is not clear from the decision that he considered Plaintiff's impairments in light of this Listing.  His discussion at step three is very general.  He found that Plaintiff did not allege that her condition met or equaled any Listing, that the State Agency reviewers did not believe that she met or equaled any Listing and that there were no medical findings "based on medically acceptable

---

[7] <u>See</u> <u>also</u> <u>e.g.</u>, <u>Wilkinson on behalf of Wilkinson v. Bowen</u>, 847 F.2d 660, 662 (11th Cir. 1987); <u>Barron v. Sullivan</u>, 924 F.2d 227, 229 (11th Cir. 1991); <u>Lowery v. Sullivan</u>, 979 F.2d 835, 837 (11th Cir. 1992); <u>Berryman v. Massanari</u>, 170 F. Supp. 2d 1180, 1186-1187 (N.D. Ala. 2001); <u>Cobb v. Barnhart</u>, 296 F. Supp. 2d 1295, 1296-1297 (N.D. Ala. 2003).

clinical and laboratory techniques" that showed that she met or equaled any Listing. (Id. at 37).   The ALJ's findings are problematic because he concluded that Plaintiff suffers from mild mental retardation and depression, and assigned determative weight to Dr. Davis's findings, including his opinion that Plaintiff's IQ scores are valid, and that her mental retardation is a lifelong condition; yet, the ALJ made no mention of Listing 12.05C, the listing for mental retardation.  Moreover, while the ALJ emphasized that the State Agency physicians did not find that Plaintiff met or equaled a Listing, a review of their evaluations does not demonstrate that they evaluated Plaintiff under Listing 12.05C. Rather, Plaintiff was evaluated under Listing 12.07.  See Supra. The bottom line is that upon a careful review of the ALJ's decision, it is simply not clear whether he concluded that Plaintiff's I.Q. scores, which on their face met the first prong of 12.05C, were invalid, or if, and on what basis, he concluded that Plaintiff's I.Q. score is inconsistent with other evidence in the record regarding Plaintiff's daily activities.  It may well be that there is evidence in the record sufficient to overcome the rebuttable presumption that Plaintiff's mental retardation manifested itself before age twenty-two; however, the undersigned cannot, at this juncture, find that the ALJ's decision is supported by substantial evidence since he did not address the evidence in light of the relevant listing, namely 12.05C.   To find otherwise would require the undersigned to

speculate and surmise about the rationale underlying the ALJ's decision, and that is not the Court's function. <u>Steele v. Barnhart</u>, 290 F.3d 936, 941 (7th Cir. 2002)(regardless of whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law require ALJ to rationally articulate the grounds for her decision and confines the court's review to the reasons supplied by the ALJ); <u>Deal v. Barnhart</u>, 2003 U.S. Dist. LEXIS 17432 (N.D. Ill 2003)(court unwilling to find that ALJ's decision is supported by substantial evidence when he did not address the evidence in light of the relevant listing.); <u>Ramos v. Barnhart</u>, 2003 U.S. Dist. LEXIS 7463 (S.D.N.Y.)(case remanded where the ALJ failed to explain the applicability of the critical regulation relating to plaintiff's claim); <u>See also</u> <u>Fitts v. Massanari</u>, 2001 WL 530475 (S.D. Ala. May 7, 2001)(holding that the ALJ erred by failing to mention Listing 12.05C in his decision and to analyze the evidence in light of the specific requirements of the Listing). <u>See also</u> <u>Chunn v. Barnhart</u>, 397 F.3d 667, 671-672 (8th Cir. 2005)(holding that the ALJ's decision, which did not even mention Listing 12.05C or otherwise indicate that he considered it relevant to plaintiff's claim, was not based on substantial evidence). Accordingly, this case should be remanded[8] for further consideration and findings with respect to whether Plaintiff meets

---

[8]In light of the undersigned's recommendation that this case be remanded, the Court has not addressed the other two issues raised in Plaintiff's brief.

the requirements for listing 12.05C in light of the record evidence.

**V.    <u>Conclusion</u>**

For the reasons set forth, and upon careful consideration of the administrative record and memoranda of the parties, it is **RECOMMENDED** that the decision of the Commissioner of Social Security, denying Plaintiff's claim for disability insurance benefits and supplemental security income, be **REVERSED** and **REMANDED.**

The attached sheet contains important information regarding objections to this <u>Report and Recommendation</u>.

**DONE** this **the 4th day of September, 2007.**

**_____/s/ SONJA F. BIVINS_____**
**UNITED STATES MAGISTRATE JUDGE**

MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS
AND RESPONSIBILITIES FOLLOWING RECOMMENDATION
<u>AND FINDINGS CONCERNING NEED FOR TRANSCRIPT</u>

1.   <u>**Objection**</u>.   Any party who objects to this recommendation or anything in it must, within ten days of the date of service of this document, file specific written objections with the clerk of court. Failure to do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the magistrate judge.   <u>See</u> 28 U.S.C. § 636(b)(1)©; <u>Lewis v. Smith</u>, 855 F.2d 736, 738 (11th Cir. 1988).    The procedure for challenging the findings and recommendations of the magistrate judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides, in part, that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten days after being served with a copy of the recommendation, unless a different time is established by order.   The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection.   The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.   It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection.   Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.   <u>**Opposing party's response to the objection.**</u>   Any opposing party may submit a brief opposing the objection within ten (10) days of being served with a copy of the statement of objection.   Fed. R. Civ. P. 72; SD ALA LR 72.4(b).

3.   <u>**Transcript (applicable where proceedings tape recorded)**</u>. Pursuant to 28 U.S.C. § 1915 and Fed.R.Civ.P. 72(b), the magistrate judge finds that the tapes and original records in this action are adequate for purposes of review.   Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is

advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.

_____/s/ SONJA F. BIVINS_____

**UNITED STATES MAGISTRATE JUDGE**